# Supreme Court of Florida

———————————

No. SC14-1175

———————————

**PAUL BEASLEY JOHNSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 1, 2016]

PER CURIAM.

This case is before the Court on appeal from sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because the jury that recommended Johnson's death sentences did not find the facts necessary to sentence him to death, we vacate Johnson's death sentences and remand this case to the circuit court for a new penalty proceeding. See Hurst v. Florida, 136 S. Ct. 616, 624 (2016); Ring v. Arizona, 536 U.S. 584, 609 (2002); Hurst v. State, 41 Fla. L. Weekly S431, S441 (Fla. Oct. 14, 2016).

## FACTS

In 1981, Paul Beasley Johnson was convicted of, among other crimes, three counts of first-degree murder in the deaths of William Evans, Daryl Ray Beasley,

Jr., and T.A. Burnham.  Johnson v. State, 438 So. 2d 774, 775-76 (Fla. 1983).  We affirmed Johnson's convictions and death sentences on direct appeal.  Id. at 780.  After the Governor signed a death warrant for Johnson, we granted Johnson's petition for a writ of habeas corpus, holding that appellate counsel in Johnson's direct appeal was ineffective for failing to raise a claim related to the sequestration of the jurors.  Johnson v. Wainwright, 498 So. 2d 938, 939 (Fla. 1986).

Following a 1987 mistrial, Johnson was retried and was again convicted and sentenced to death.  Johnson v. State, 608 So. 2d 4, 8 (Fla. 1992).

> The following evidence was presented at the new trial.  The evening of January 8, 1981 Johnson and his wife visited their friends Shayne and Ricky Carter.  During the evening they all took injections of crystal methedrine and smoked marijuana.  Johnson left the Carters' home later in the evening, and Ricky testified that Johnson said he was going to get more drugs and that he might steal something or rob something.  Shayne testified that Johnson said that he was going to get money for more drugs and that "if he had to shoot someone, he would have to shoot someone."
>
> A taxicab company dispatcher testified that driver William Evans went to pick up a fare at 11:15 p.m. on January 8 and called in to confirm the fare fifteen minutes later.  Around 11:55 p.m. a stranger's voice came over the radio.  Among other things, the stranger said that Evans had been knocked out.  He stayed in touch with the dispatcher off and on until about 2:00 a.m.  The dispatcher did not hear Evans after 11:30 p.m., and workers in an orange grove found Evans' body on January 14.  Evans had been robbed and shot twice in the face.  Searchers found his taxicab, which had been set on fire, in an orange grove about a mile from Evans' body.
>
> When she got off work in the early hours of January 9, 1981, Amy Reid and her friend Ray Beasley went to a restaurant for breakfast.  Johnson approached them in the parking lot and asked for a ride, claiming that his car had broken down.  Beasley agreed to drive Johnson to a friend's house.  During the drive, Johnson asked Beasley

to stop the car so that he could urinate.  While out of the car, Johnson asked Beasley to come to the rear of the car.  When Reid looked back, she saw Johnson holding a handgun pointed at Beasley.  She then locked the car's doors, moved to the driver's seat, and drove away to look for help.

Reid telephoned the sheriff's department from a convenience store, and deputies Clifford Darrington and Samuel Allison responded to her call around 3:45 a.m.  The deputies drove Reid back to where she had left Johnson and Beasley, but found no one there.  Back in the patrol car they heard a radio call from another deputy, Theron Burnham, advising that he had seen a possible suspect on the road.  When they arrived at Burnham's location, they found his patrol car parked with the motor running, the lights on, and a door open, but could not see Burnham.  Johnson, however, walked in front of their car, spoke to them, and then began firing at them with a handgun.  The deputies returned Johnson's shots, and he ran across a field and disappeared among some trees.  Allison then found Burnham's body in a roadside drainage ditch.  He had been shot three times, and his service revolver was missing.

Later that day, Beasley's body was found seven-tenths of a mile from where Burnham was killed.  He had been shot once in the head, and his body was in a weedy area and could not be seen from the road.  Although there were some coins in his pockets, his wallet was gone.  The following afternoon Johnson's wife was still at the Carters' home.  They saw a police sketch of the suspect in the night's events in a newspaper and discussed whether it looked like Johnson.  Johnson telephoned the Carters' home, and, after speaking with him, his wife became very upset.  Ricky Carter asked Johnson if he had done the killings reported in the newspaper, and Johnson replied: "If that's what it says."  Carter went to pick up Johnson, taking a shirt that Johnson changed into.  Johnson threw the shirt he had been wearing, which had been described in the newspaper, out the car's window.  While driving home, Carter heard Johnson's wife ask, "You killed him, too?" to which Johnson replied, "I guess so."  At the Carters' home Johnson told them that he hit the deputy with his handgun when told to place his hands on the patrol car and then struggled with him, during and after which he shot the deputy three times.

The authorities arrested Johnson for the Beasley and Burnham murders on January 10 and charged him with Evans' murder the

following week.  Reid, Allison, and Darrington identified him, and his fingerprints were found in Evans' taxicab.

    While Johnson was in jail awaiting trial, inmate James Leon Smith was in a cell near him.  At trial Smith testified that Johnson told him that he killed a taxicab driver and set the taxicab on fire to destroy his fingerprints, that he shot Beasley while Beasley was on his knees and stole one hundred dollars from Beasley, and that he shot the deputy.

We affirmed Johnson's convictions and sentences.  Id. at 13.

Johnson filed an initial postconviction motion in 1994.  Johnson v. State, 769 So. 2d 990, 992 (Fla. 2000).  The postconviction court denied the motion, and we affirmed.  Id. at 1006.  In 2002, we denied Johnson's petition for a writ of habeas corpus.  Johnson v. Moore, 837 So. 2d 343, 348 (Fla. 2002).  Johnson filed a successive postconviction motion in 2003.  The postconviction court denied Johnson's motion, and we affirmed.  Johnson v. State, 993 So. 2d 1153 (Fla. 2006) (table decision).

In 2007, Johnson filed a second successive postconviction motion.  Johnson v. State, 44 So. 3d 51, 56 (Fla. 2010).  The postconviction court denied Johnson's claim.  Id.  Shortly thereafter, the Governor signed a second death warrant.  Id.  With both the appeal and death warrant pending, Johnson filed a third successive postconviction motion.  Id.  We held that newly discovered evidence revealed that the jailhouse informant, James Leon Smith, "was acting as a government agent, and his testimony and notes concerning Johnson's statements should have been suppressed."  Id. at 64.  We further held that "the misconduct of the original

- 4 -

prosecutor in this case, Hardy Pickard, . . . tainted the State's case at every stage of the proceedings and irremediably compromised the integrity of the entire 1988 penalty phase proceeding." Id. at 64, 73. While we found any problem harmless as to Johnson's convictions, we reversed the postconviction court's denial of Johnson's second postconviction motion, vacated the sentences of death, and ordered a new penalty phase proceeding before a new jury. Id. at 68-69, 73-74.

Following a new penalty phase proceeding in 2013, the jury recommended that Johnson be sentenced to death by votes of eleven to one for each of the three murders. The sentencing court considered six statutory aggravating circumstances,[1] three statutory mitigating circumstances,[2] and ten nonstatutory

_____

1. (1) The sentencing court found that Johnson had committed a prior violent felony and gave that factor great weight as to all three murders. (2) The sentencing court found that Johnson had murdered Evans during the commission of a kidnapping or arson but gave it no weight because it may have constituted improper doubling. Additionally, the sentencing court explicitly did not find that Johnson had murdered Beasley during a kidnapping or arson. (3) The sentencing court found that Johnson had murdered both Evans and Beasley for financial gain and gave that factor great weight as to both murders. (4) The sentencing court explicitly did not find that Johnson had murdered Burnham in order to avoid arrest because this factor merged with the law enforcement victim aggravating factor. (5) The sentencing court found that one of Johnson's victim, T.A. Burnham, was a law enforcement officer engaged in the performance of his official duties and gave that factor extreme great weight. (6) The sentencing court found that Johnson had murdered both Evans and Beasley in a cold, calculated, and premeditated manner, and gave that factor very great weight as to both murders.

2. The sentencing court found that: (1) Johnson committed the murder while under the influence of extreme mental or emotional disturbance and gave that factor slight weigh; (2) Johnson had an impaired capacity to appreciate the

- 5 -

mitigating circumstances,[3] and imposed the death sentences.  Johnson now appeals

to this Court.

## ANALYSIS

Johnson argues that his death sentences violate <u>Ring</u> and <u>Hurst v. Florida</u>

because his penalty phase jury did not find the facts necessary to sentence him to

death.  We agree.  <u>See</u> <u>Hurst v. Florida</u>, 136 S. Ct. at 624; <u>Ring</u>, 536 U.S. at 609;

<u>Hurst</u>, 41 Fla. L. Weekly at S438.  We reject the State's contention that Johnson's

contemporaneous convictions for other violent felonies insulate Johnson's death

---

criminality of his conduct or to conform his conduct to the requirements of law and gave that factor slight weight; and (3) other factors in Johnson's character, background, or life mitigate against the imposition of the death penalty and gave that factor moderate weight.

3. The sentencing court found that:  (1) Johnson suffered from brain damage and drug use that may have impaired his ability to reflect on and consider his actions and gave that factor moderate weight; (2) Johnson was the biological son and grandson of violent alcoholics and gave that factor slight weight; (3) Johnson's mother was sick throughout her pregnancy and had a traumatic childbirth with him, and gave that factor slight weight; (4) Johnson's mother suffered physical abuse from Johnson's father while Johnson was developing in the womb and gave that factor slight weight; (5) Johnson was abandoned by his biological father and mother as a toddler and gave that factor very slight weight; (6) Johnson was raised by his elderly paternal grandparents and gave that factor slight weight; (7) Johnson had attempted to reunite with his son and wife, and gave that factor slight weight; (8) Johnson began to abuse alcohol, drugs, and inhalants at a young age and gave that factor slight weight; (9) Johnson could be punished by the imposition of three consecutive life sentences and gave that factor very slight weight; and (10) Johnson could be required to serve those three life sentences consecutively after he has completed the other prison terms to which he had been sentenced, and gave that factor very slight weight.

- 6 -

sentences from Ring and Hurst v. Florida. See Hurst, 41 Fla. L. Weekly at S448 n.7. However, we also reject Johnson's argument that section 775.082(2), Florida Statutes (2015), requires that we remand Johnson's case to the trial court for imposition of a life sentence. See Hurst, 41 Fla. L. Weekly at S440.

Because a sentencing error "in which the judge rather than the jury made all the necessary findings to impose a death sentence[] is not structural error incapable of harmless error review," the only remaining question is whether the violation of Hurst v. Florida in this case was harmless. Hurst, 41 Fla. L. Weekly at S442. We conclude that the error was not harmless beyond a reasonable doubt.

> The harmless error test, as set forth in Chapman [v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). In the context of a sentencing error, the relevant question is whether "there is [a] reasonable possibility that the error contributed to the sentence." Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).

> [I]n the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case.

Hurst v. State, 41 Fla. L. Weekly at S442. We also clarify what the test is not:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139.

After reviewing the evidence in this case, we cannot conclude beyond a reasonable doubt that the Hurst v. Florida sentencing error in this case would have been harmless beyond a reasonable doubt. Cf. Hurst v. State, 41 Fla. L. Weekly at S443.

The facts of this case obviously include substantial aggravation. Johnson set out on a drug-fueled hunt for money to purchase more drugs, so determined to succeed that "if he would have to shoot someone, he would have to shoot someone." Johnson murdered a taxi driver who had been dispatched to pick up a fare, a Good Samaritan who Johnson tricked into believing that his car was broken down, and a deputy sheriff who had stopped Johnson as part of the manhunt for the perpetrator of Johnson's two earlier murders.

However, "[t]he record in this case demonstrated that the evidence of mitigation was extensive and compelling." Id. Johnson suffered brain damage, making him more prone to drug dependency, and at the time of the murders was under the influence of a form of drug-induced psychosis and delirium. Following a lifetime of drug abuse that began at a very young age, Johnson had been ingesting

- 8 -

marijuana and crystal methedrine on the night of the murders, which impacted his ability to appreciate the criminality of his conduct. Johnson's upbringing contributed to his problems. He was abandoned by his parents to his elderly grandparents after birth, and both Johnson's biological father and biological grandfather were violent alcoholics. Johnson was held back numerous times in school and never progressed beyond the seventh grade. Even before his birth, Johnson suffered: his mother was sick throughout the pregnancy and received little or no prenatal care; and Johnson's biological father regularly beat Johnson's mother while she was pregnant with Johnson. Over the past thirty years, Johnson has been a good prisoner with few disciplinary reports and has been very remorseful concerning the murders.

We are unable to conclude "beyond a reasonable doubt [that] there is no possibility that the <u>Hurst v. Florida</u> error in this case contributed to the sentence." <u>Id.</u> As in <u>Hurst</u>,

> [b]ecause there was no interrogatory verdict, we cannot determine what aggravators, if any, the jury unanimously found proven beyond a reasonable doubt. We cannot determine how many jurors may have found the aggravation sufficient for death. We cannot determine if the jury unanimously concluded that there were sufficient aggravating factors to outweigh the mitigating circumstances.

<u>Id.</u> On this record, with a nonunanimous jury recommendation and a substantial volume of mitigation evidence, we simply cannot conclude, "beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating

circumstances were sufficiently substantial to call for leniency." State v. Ring, 65 P.3d 915, 946 (Ariz. 2003). Accordingly, "we must find reversible error and remand the case for resentencing." Id.

**CONCLUSION**

In light of the foregoing, we vacate Johnson's death sentence and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and PERRY, JJ., concur.
PERRY, J., concurs in part and dissents in part with an opinion.
POLSTON, J., dissents.
QUINCE and CANADY, JJ., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PERRY, J., concurring in part and dissenting in part.

I concur in the majority's decision to vacate Johnson's death sentences because they violate the Sixth Amendment. See majority op. at 1; see also Hurst v. State, 441 Fla. L. Weekly S431, S441 (Fla. Oct. 24, 2016).

However, I respectfully dissent from the majority's decision not to apply the plain text of section 775.082(2), Florida Statutes. Because his death sentences are unconstitutional, Johnson is entitled to the remedy that the Legislature has specified. The sentencing court must sentence him to life in prison. See § 775.082(2), Fla. Stat. (2015).

- 10 -

The statute's language is clear and unambiguous.

> In the event <u>the death penalty in a capital felony is held to be unconstitutional</u> by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1). No sentence of death shall be reduced as a result of a determination that a method of execution is held to be unconstitutional under the State Constitution or the Constitution of the United States.

<u>Id.</u> (emphasis added). We need engage in no further legal gymnastics to carry out the will of the Legislature. <u>See, e.g.</u>, <u>English v. State</u>, 191 So. 3d 448, 450 (Fla. 2016) ("When the statutory language is clear or unambiguous, this Court need not look behind the statute's plain language or employ principles of statutory construction to determine legislative intent.").

Life in prison is the default position for a defendant convicted of capital murder. In order to increase that default sentence to death, there must be a constitutional means of imposing a death sentence. The majority and I agree that Johnson was not sentenced to death in a manner compliant with the Constitution. Accordingly, death is not an option: the sentencing court must impose life sentences pursuant to section 775.082(2), Florida Statutes. For that reason, I would remand this case to the trial court for the imposition of life sentences. <u>See</u> <u>Hurst v. State</u>, 41 Fla. L. Weekly at S445 (Perry, J., dissenting).

- 11 -

An Appeal from the Circuit Court in and for Polk County,
Donald G. Jacobsen, Chief Judge – Case No. 531981CF000112A1XXXX

Howard L. Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Timothy Arthur Freeland, Assistant Attorney General, Tampa, Florida,

for Appellee