# Supreme Court of Florida

––––––––––

No. SC17-2231

––––––––––

**RANDALL T. DEVINEY,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

May 6, 2021

PER CURIAM.

Randall T. Deviney appeals the sentence of death imposed on him after a new penalty phase ordered by this Court in *Deviney v. State*, 213 So. 3d 794 (Fla. 2017).  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons explained below, we affirm the sentence of death.

## A. BACKGROUND

Deviney was convicted[1] by a jury of the August 5, 2008, first-degree murder of Dolores Futrell at her home in Jacksonville, Florida. *Deviney*, 213 So. 3d at 798. The jury found that the murder was both premeditated and "committed during the commission of a felony, with burglary or attempted burglary and attempted sexual battery as the underlying felonies." *Id.* The trial court sentenced Deviney to death following an eight-to-four jury vote recommending a sentence of death during the penalty phase. *Id.* On direct appeal, we found no error in the guilt phase of trial and affirmed Deviney's conviction. *Id.* at 800. However, we remanded for a new penalty phase pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020). *Deviney*, 213 So. 3d at 799.

---

1. Before this conviction, Deviney was previously convicted and sentenced to death for the same offense. *Deviney v. State*, 112 So. 3d 57, 60 (Fla. 2013). We reversed the conviction and sentence, however, and remanded for a new trial due to *Miranda v. Arizona*, 384 U.S. 436 (1966), violations that occurred during the police interrogation of Deviney prior to his arrest. *Deviney*, 112 So. 3d at 79.

On October 11, 2017, the trial court conducted the new penalty phase. As the new penalty-phase jury did not hear the evidence that was presented during the guilt phase of Deviney's trial, the State presented virtually the same evidence and witness testimony introduced in the guilt phase during the new penalty proceedings. We previously described the guilt phase evidence as follows:

> [A]t 10:01 p.m., a Jacksonville police dispatcher received an unverified 911 call from Futrell's residence. Along with another officer, Officer Milowicki of the Jacksonville Sheriff's Office responded to the call.
> . . . .
> Milowicki found Futrell lying on the carpet in front of her television. She recalled:
>
> > It was a petite, elderly female. She was cut ear-to-ear and the cut was so deep that it was hanging by just skin on the back of her neck. Her shirt was pulled over her torso exposing her torso. And her underwear, she just had underwear on and the underwear was sliced at the crotch area and pulled up by her hips. So she was nude from the waist down. And her legs had appeared to be posed in a sexual manner showing her genitalia.
>
> Strangely, there was little blood inside the home. Milowicki observed a small table in the dining room with objects knocked over beside a cordless phone base. The phone was on the dining room table and, based on the call log, the police determined that it had been previously used to dial 911. The contents of a purse were emptied

- 3 -

onto Futrell's couch; however, Futrell's wallet was across the room on an ironing board. Credit cards laid scattered beside the wallet, which contained a total of fifty-six cents. Behind the ironing board, near the back door, Milowicki saw a pair of bloody blue jeans.

While walking in the backyard, Milowicki heard "what sounded like a squeegee noise around [her] feet." Her flashlight confirmed that she was standing in a pool of blood that engulfed her shoes. From that vantage, in the center of the backyard, Milowicki noticed blood stains on and near a koi pond in the corner along the fence. Further, she noted that although the pond was lit by a white light, the water was "bright red." . . .

The crime scene unit, including Detective Gray, arrived around midnight. While examining the backyard, Gray identified the blood on the ledge and side of the koi pond as transfer blood. . . .

Inside the home, Gray examined Futrell's body . . . . Gray opined that, based on the evidence, Futrell was killed in the backyard, dragged inside her home, and—possibly—posed in an explicit position to resemble a sexual battery. . . .

Dr. Giles, M.D., a forensic pathologist, conducted an autopsy on Futrell's body. Futrell was sixty-five inches tall (5'5')[sic], 138 pounds, and sixty-five years old. Dr. Giles determined that the cause of death was hypovolemic shock with asphyxiation due to an incised wound of the neck, laryngeal transection: "In layman's terms, she received a large cut across her neck [that] went right through her voice-box and she bled and couldn't breathe." Futrell suffered both blunt- and sharp-force injuries. Based on his examination, Dr. Giles believed that "there definitely was a struggle involved in this death." The manner of death was determined as homicide.

On the left side of Futrell's head were various blunt-force injuries: contusions and abrasions around her eye, forehead, and temple, plus abrasions around the nose and mouth. On the right side of Futrell's head, near her

mouth and eye, were different types of abrasions than those on the left. Dr. Giles opined that these particular abrasions occurred later in the course of events, either when Futrell was nearly or already dead, because they were yellow.

According to Dr. Giles, the large cut across Futrell's neck went from right to left. It sliced through Futrell's veins, but not her deeper arteries. However, it partially severed the jugular vein, the major vein on the right side of the neck, which meant that it could not snap shut and continued to bleed. Dr. Giles noted that the incision "completely separated" the upper and lower larynx between the vocal cords. Behind that, the esophagus was partially cut. Taking these together, Dr. Giles opined that Futrell was pulling blood into her lungs as she struggled to breathe. Dr. Giles testified that this sharp-force injury was a straight, clean cut, indicating that it was delivered with a non-serrated blade. When asked how long Futrell lived after her throat was cut, Dr. Giles testified that he could not give a definite answer. However, Futrell lived for only "a short time" due to her neck wound, anywhere from seconds to a few minutes.

Coupled with that injury, Dr. Giles found a major blunt-force injury to Futrell's neck. Specifically, Dr. Giles observed evidence of crushing blunt force applied to Futrell's upper neck, fracturing her hyoid bone. The larynx was fractured above the cut as well. Because these fractures stopped at the cut, and there was little hemorrhaging in the fractures, this injury likely occurred after Futrell's neck was cut. In Dr. Giles' opinion, the crushing-type force was applied on both sides of Futrell's neck, consistent with strangulation or a choke hold. Dr. Giles testified that this injury occurred prior to Futrell's death; however, it was late in the process.

Aside from the fatal neck injuries, on Futrell's chest were various blunt- and sharp-force injuries. There were superficial incisions. Further, small pricks indicated where Futrell was poked with a sharp object. Some of the injuries on her chest were consistent with dragging a

sharp object against it. One injury on her chest was a pattern injury, an abrasion with an unusual outline. Dr. Giles testified that this pattern was consistent with a serrated knife, but it could have been made by a broken knife blade. Dr. Giles could not definitively testify as to the sequencing of the injuries on Futrell's chest in relation to the fatal neck wound. However, he opined that the superficial cuts and pricks must have occurred at or about the same time due to bruising.

On Futrell's left arm were abrasions and sharp-force injuries. Various contusions and bruises on Futrell's hands and arms appeared to be defensive wounds. However, there was little to no blood on Futrell's hands. Futrell's lower back had a large abrasion, which indicated that she had been dragged. Another abrasion on her lower back suggested that Futrell had a garment on when the injury occurred.

When Dr. Giles conducted the autopsy, Futrell's shirt was still rolled up. There were cuts on the shirt, but when the shirt was rolled down one cut did not align with the injuries on her body; thus, Dr. Giles concluded that the particular injury occurred when Futrell's shirt was rolled up. A sexual battery kit was used to test Futrell's oral, vaginal, anal, and breast areas. There were no injuries to Futrell's sexual organs. This led Dr. Giles to the conclusion that no sexual activity occurred; however, he could not rule out the possibility that attempted sexual activity occurred. Finally, Dr. Giles took Futrell's fingernail clippings for DNA testing.

Evidence was sent to the Florida Department of Law Enforcement (FDLE) for DNA testing. . . . Preliminary DNA testing of Futrell's right fingernail clippings matched Deviney. When the DNA profiles of Deviney and Futrell were analyzed, FDLE concluded that there was a 1 in 40 billion chance that anyone other than Deviney left the DNA sample.

These results were forwarded to the Jacksonville Sheriff's Office, which necessitated a confirmation sample. So, detectives brought Deviney to the police

station to be questioned, tested, and subsequently arrested. In the days following his arrest, Deviney placed two calls to his father, Michael Deviney. The State introduced recordings of these calls into evidence. In one call, Deviney confessed to the murder, saying, "I lost it. It wasn't me. It was another person inside me."

The State called other witnesses during the guilt phase. Through that testimony, the State elicited evidence that Futrell had multiple sclerosis (MS), which prevented her from walking her large dog or doing yard work. Although she could walk up the stairs in her townhome, she had become very frail over the years. Further, Futrell was a grandmother-type figure for Deviney during his childhood; she cared for him from the time he was seven and she would bake cookies for him. One neighbor testified that, following the murder, Deviney told her that "he heard [Futrell] had been violated." However, the lead detective testified that specific crime scene information was not released prior to Deviney's arrest. Also, Deviney's mother, Nancy Mullins, testified that Deviney had asked her for scissors or a knife on the night of the murder. Mullins told him that there was a straight-blade fish fillet knife in their tackle box, which she never saw again.

After the State completed the presentation of its case, Deviney waived his right to remain silent and testified. During his testimony,[2] Deviney admitted to killing Futrell.

*Id.* at 795-98 (footnotes omitted).

---

2. During his testimony, Deviney presented his version of the events concerning the murder of Futrell. In reviewing Deviney's testimony, however, we explained that "[t]here were various inconsistencies that the State raised surrounding Deviney's story." *See Deviney*, 213 So. 3d at 798.

- 7 -

Deviney then presented his case for mitigation. Michael Deviney, Deviney's father, testified as to events concerning Deviney's family environment and upbringing. Debra Jackson, a voluntary jail chaplain, testified as to Deviney's faith and remorse over the murder. Deviney also presented the testimony of two psychologists, Dr. Steven Bloomfield and Dr. Steven Gold, both of whom evaluated Deviney on several occasions.

At the end of the new penalty phase, the jury returned a unanimous verdict recommending that Deviney be sentenced to death. The jury unanimously found three aggravators beyond a reasonable doubt—(1) the murder was committed while Deviney was engaged in the commission of a burglary, an attempt to commit a burglary, or an attempt to commit a sexual battery; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) Futrell was a particularly vulnerable victim due to advanced age or disability (PVV)—unanimously found the aggravators were sufficient to impose the death penalty, and unanimously found those aggravators outweighed the mitigation it found.[3] On October 25,

_____

3. By a ten-to-two vote, the jury found the statutory mitigator that the murder was committed while Deviney was under the

- 8 -

2017, the trial court held a *Spencer*[4] hearing, at which Deviney presented the testimony of his stepmother given at his previous penalty-phase trial.

On December 11, 2017, the trial court sentenced Deviney to death. The trial court agreed with the jury's findings on the aggravators (assigning each great weight) and certain mitigators, and found further mitigation that was rejected by the jury. In analyzing the mitigation in the case, the trial court consolidated some of the mitigation and then assigned varying degrees of weight to each mitigator.[5] Deviney now appeals his new sentence of death.

---

influence of extreme mental or emotional disturbance. The jury also found fourteen nonstatutory mitigators.

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

5. The trial court assigned minimal weight to the statutory mitigator that Deviney committed the murder while being under the influence of extreme mental or emotional disturbance. While the jury rejected the statutory mitigator of Deviney's age of eighteen at the time of the murder, the trial court disagreed, finding it was established and assigning it some weight.

In considering the nonstatutory mitigation, the trial court found the following mitigators after consolidation and assigned each degrees of weight: (1) Deviney's parents were convicted of killing his brother before Deviney was born and were still allowed to have custody of him and his younger brother (little weight); (2) Deviney's brother stabbed him, and when taken to the hospital, foreign

## B.    ANALYSIS

On appeal, Deviney raises the following five claims: (1) the trial court erroneously denied his cause challenges against two prospective jurors; (2) the trial court committed fundamental error by failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravators were sufficient and outweighed the mitigators to impose death; (3) the trial court erred

---

objects were found in his body (slight weight); (3) Deviney bounced between parents, which created a very unstable upbringing (minimal weight); (4) Deviney was involved in Child Find and awarded a special diploma (minimal weight); (5) Deviney is a Christian (minimal weight); (6) while pregnant with Deviney, his mother smoked tobacco (no weight); (7) Deviney was physically abused by his father (slight weight); (8) Deviney was physically abused by his mother (slight weight); (9) Deviney was verbally abused by his mother (minimal weight); (10) Deviney was sexually abused by his mother (minimal weight); (11) Deviney was sexually abused by his mother's drug dealer (minimal weight); (12) Deviney was verbally abused by his father (minimal weight); (13) Deviney was neglected by his mother as far as supervision, his health, and his educational upbringing (slight weight); (14) Deviney's parents both engaged in and were arrested for domestic battery against each other (some weight); (15) Deviney is close with his father (some weight); (16) Deviney is close with his stepmother (some weight); (17) Deviney was prescribed medication for behavior and learning disabilities as a child and his parents refused to administer the medication (no weight); (18) Deviney was hit in the head with a baseball bat (no weight); (19) Deviney suffers from exposure to abuse and emotional deprivation (some weight); and (20) Deviney witnessed violence and was exposed to a great deal of trauma (some weight).

by denying Deviney's motion to bar the death penalty because he was under the age of twenty-one at the time he committed the murder; (4) error occurred when the trial court instructed the jury on the PVV aggravator and both the jury and the trial court found that aggravator; and (5) error occurred when the trial court instructed the jury on the HAC aggravator and both the jury and the trial court found that aggravator.[6]  We address each claim in turn.

### 1.    Cause Challenges Against Prospective Jurors

Deviney first argues that the trial court erroneously denied his cause challenges against prospective jurors Sutherland and Henderson.  "The validity of a cause challenge is a mixed question of law and fact, on which a trial court's ruling will be overturned only for 'manifest error,' " which "is tantamount to an abuse of discretion."  *Johnson v. State*, 969 So. 2d 938, 946 (Fla. 2007)

---

6. Deviney also argues that his sentence of death is not proportionate.  However, after oral argument in this case, in *Lawrence v. State*, 308 So. 3d 544, 552 (Fla. 2020), we receded from the judge-made requirement to review the comparative proportionality of death sentences as contrary to the conformity clause of the Florida Constitution.  Accordingly, we do not review the proportionality of Deviney's sentence of death.

(quoting *Fernandez v. State*, 730 So. 2d 277, 281 (Fla. 1999)). In reviewing a trial court's denial of a cause challenge against a prospective juror, we have "recognized that the trial court has a unique vantage point in the determination of juror bias . . . [and] is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record." *Ault v. State*, 866 So. 2d 674, 683-84 (Fla. 2003) (quoting *Smith v. State*, 699 So. 2d 629, 635-36 (Fla. 1997)). Therefore, "[t]he decision to deny a challenge for cause will be upheld on appeal if there is competent record support for the decision." *Barnhill v. State*, 834 So. 2d 836, 844 (Fla. 2002).

For a prospective juror to be excused "for cause," that juror must possess "a state of mind regarding the case 'that will prevent the juror from acting with impartiality.' " *Johnson*, 969 So. 2d at 946 (quoting § 913.03(10), Fla. Stat. (2006)); *accord Ault*, 866 So. 2d at 683 ("The test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court."). In the context of a capital case, "this standard is met if a juror's views on the death penalty 'prevent or substantially impair

the performance of his or her duties as a juror in accordance with the juror's instructions or oath.' " *Johnson*, 969 So. 2d at 946 (quoting *Fernandez*, 730 So. 2d at 281). "[I]f any reasonable doubt exists as to whether the juror possesses an impartial state of mind," the trial court must excuse that juror for cause. *Ault*, 866 So. 2d at 683; *accord Hill v. State*, 477 So. 2d 553, 555 (Fla. 1985).

Deviney asserts that a reasonable doubt existed as to whether the views of prospective jurors Sutherland and Henderson would substantially impair either's ability to vote to impose any sentence other than death for a premeditated, first-degree murder, regardless of the balance of aggravators and mitigators in the case. On this basis, Deviney claims that the trial court abused its discretion in denying his two cause challenges to Sutherland and Henderson. We disagree.

As to Sutherland, evidence in the record supports the trial court's denial of the cause challenge. During voir dire, the State prosecutor asked Sutherland if she understood that the death penalty was "not automatic, that you've got to consider the aggravators and . . . mitigators," to which Sutherland responded, "Absolutely." While some of Sutherland's responses to defense

counsel's initial questioning indicated she had a predisposition to imposing death on a defendant who committed premeditated murder, the parties were permitted to further question Sutherland. The State prosecutor asked Sutherland whether she could "follow the instructions or the law . . . about the death penalty," to which she replied, "Yes." Sutherland also confirmed that she understood she was never compelled to vote for death because a person was convicted of first-degree murder, that she could weigh the aggravators and mitigators, and that the death penalty was not automatic. Defense counsel subsequently asked Sutherland if there would be "any way that [she] could vote for life without parole if a person was convicted of premeditated first[-]degree murder." Sutherland initially replied, "Yes, there could be depending on the facts," before explaining:

> [SUTHERLAND]: Well, . . . if this person went in and deliberately without a second thought about murdering somebody, okay, if he did that I feel that there's no rehabilitation for that and if he deliberately went in and knew that he was going to do harm and take a life then that's the choice he made, so if it was all the facts laid out and I saw that there was . . . no other alternative for this individual then, yes, it would be death but I can't honestly sit here and say that, no, I won't say that he couldn't be in prison for life without parole if I get all the facts.

- 14 -

Defense counsel then sought further clarification from Sutherland:

> [DEFENSE]: Thank you, Your Honor. The conviction itself says it was premeditated with a specific intent or done while going and doing one of the felonies that I've gone over, the conviction itself. Knowing that someone committed a first[-]degree murder with premeditation and specific intent or while in the commission of a burglary, robbery, kidnapping or aggravated assault or murder of another individual, would you automatically vote for the death penalty?
> [SUTHERLAND]: No.

Given the "great discretion" given to a trial court in "deciding whether a challenge for cause based on juror incompetency is proper," *Ault*, 866 So. 2d at 684, we find that the trial court did not abuse its discretion in denying Deviney's cause challenge against Sutherland.

Likewise, a plurality of this Court concludes that the trial court did not abuse its discretion in denying Deviney's cause challenge against Henderson, as there is evidence to support the trial court's denial. While Henderson initially expressed a disposition to automatically imposing the death penalty where the first-degree murder was premeditated, the trial court permitted further questioning of Henderson by both parties. During this subsequent questioning, the State prosecutor asked whether

- 15 -

Henderson could "follow the law" to impose the death penalty "in an appropriate case," to which he replied, "Yes, I can." Henderson also stated that he understood the death penalty was not automatic and that he could listen to and consider the mitigation presented and make his decision after weighing the aggravators and mitigators in the case. Although some of Henderson's answers to defense counsel's subsequent questioning again indicated a predisposition to imposing death if the murder was premeditated, we emphasize our "deference to the trial judge who sees and hears the juror and often has to make credibility findings that cannot be easily discerned from an appellate record." *Ault*, 866 So. 2d at 684; *see also Barnhill*, 834 So. 2d at 845 ("[T]he trial court is given broad discretion to determine whether a prospective juror is qualified to serve based on the juror's demeanor and attitude about whether he or she will follow the law."). Accordingly, given our deferential review, a plurality of the Court finds that the trial court did not abuse its discretion in denying the cause challenge to Henderson. As demonstrated by Justice Lawson's concurring in part and concurring in result opinion, although the Court is split as to whether the trial court abused its discretion, a majority

- 16 -

nevertheless agrees that Deviney is not entitled to a new trial. Therefore, we deny relief as to this claim.

## 2. Sufficiency of the Jury Instructions

Deviney next argues that the trial court erred by failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravators were sufficient to impose death and whether those aggravators outweighed the mitigators in his case. Although Deviney concedes that he failed to request the beyond-a-reasonable-doubt instruction and to object to the actual instructions read to the jury, he claims this failure to instruct constitutes fundamental error.

We reject Deviney's argument. We have repeatedly held that "these determinations are not subject to the beyond a reasonable doubt standard of proof," *Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (citing *Rogers v. State*, 285 So. 3d 872, 878-79 (Fla. 2019), *receded from on other grounds by Lawrence*, 308 So. 3d at 548); *see also Rogers*, 285 So. 3d at 886 (holding that "the sufficiency and weight of the aggravating factors and the final recommendation of death" are not elements and "are not subject to the beyond a reasonable doubt standard of proof"), and none of

Deviney's arguments warrants reconsidering our precedent. Accordingly, because the trial court did not err, let alone fundamentally so, in instructing the penalty-phase jury, we deny relief as to this claim.

### 3.  *Roper* Claim

Deviney, who was almost nineteen years old at the time of the murder, asserts that the trial court erred by denying his motion to bar the imposition of the death penalty, as his sentence of death is unconstitutional.  He contends that the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551, 567-68 (2005), which held the imposition of the death penalty on individuals under the age of eighteen at the time they committed their murders to be unconstitutional based on the "objective indicia" of society's standards, should be expanded to individuals under the age of twenty-one at the time they committed their murders.  In support of this argument, Deviney claims that there is an emerging national consensus against imposing death on individuals under the age of twenty-one at the time of their offenses, based on recent legislation and sentencing practices in other states, nationwide execution

statistics for late adolescents, and the different treatment of late adolescents from adults in other facets of society.

We decline Deviney's invitation to expand *Roper*. This Court has repeatedly rejected defendants' *Roper* claims where the defendant was not under the age of eighteen at the time of his or her capital offense. *See, e.g., Branch v. State*, 236 So. 3d 981, 986-87 (Fla. 2018); *Barwick v. State*, 88 So. 3d 85, 106 (Fla. 2011); *Schoenwetter v. State*, 46 So. 3d 535, 561 (Fla. 2010); *Hill v. State*, 921 So. 2d 579, 584 (Fla. 2006). As we recently stated in *Branch*:

> [T]he United States Supreme Court has continued to identify eighteen as the critical age for purposes of Eighth Amendment jurisprudence. *See Miller v. Alabama*, 567 U.S. 460, 465 (2012) (prohibiting mandatory sentences of life without parole for homicide offenders who committed their crimes before the age of eighteen); *Graham v. Florida*, 560 U.S. 48, 74-75 (2010) (prohibiting sentences of life without parole for nonhomicide offenders who committed their crimes before the age of eighteen). Therefore, unless the United States Supreme Court determines that the age of ineligibility for the death penalty should be extended, we will continue to adhere to *Roper*.

236 So. 3d at 987. Therefore, because Deviney was eighteen years old at the time he committed the murder, he is not entitled to relief under *Roper*.

### 4. PVV Aggravator

Deviney also claims that error occurred when the trial court instructed the jury on the PVV aggravator and when both the jury and the trial court found the PVV aggravator. This claim lacks merit.

First, Deviney never objected to the jury being instructed on the PVV aggravator. In fact, Deviney included the PVV aggravator in his proposed jury instructions and affirmatively agreed at trial to the inclusion of the PVV aggravator in the final jury instructions before they were read to the jury. Therefore, Deviney did not properly preserve this claim attacking the PVV instruction to the jury for appellate review. *See Universal Ins. Co. of N. Am. v. Warfel*, 82 So. 3d 47, 65 (Fla. 2012) ("Fundamental error is waived where defense counsel requests an erroneous instruction . . . [or] where defense counsel affirmatively agrees to an improper instruction."); *see also Rogers*, 285 So. 3d at 887; *Boyd v. State*, 200 So. 3d 685, 702 (Fla. 2015).

Additionally, the finding of the PVV aggravator was not in error. In reviewing the finding of an aggravator, this Court "review[s] the record to determine whether the trial court applied

the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding." *Boyd v. State*, 910 So. 2d 167, 191 (Fla. 2005). To establish the PVV aggravator, the State must prove beyond a reasonable doubt that the victim was "particularly vulnerable due to advanced age or disability." § 921.141(2)(a), (6)(m), Fla. Stat. (2017). "[T]he finding of this aggravator is not dependent on the defendant targeting his or her victim on account of the victim's age or disability." *Woodel v. State*, 804 So. 2d 316, 325 (Fla. 2001); *accord Caylor v. State*, 78 So. 3d 482, 496 (Fla. 2011). Additionally, a "significant disparity in age between the victim[] and [the] attacker is a proper consideration for this aggravator." *Woodel*, 804 So. 2d at 325.

Based upon our review of the record, we find that there is competent, substantial evidence to support the finding of the PVV aggravator. Futrell was sixty-five years old at the time of her murder. She was diagnosed with MS, which caused her to have balance and coordination problems. Due to her MS, Futrell's condition had progressively deteriorated over the last five to six years of her life, causing her to have further weakness, difficulty performing certain tasks such as caring for her dog, and trouble

with walking. Furthermore, there was a significant age disparity of forty-seven years between Futrell and Deviney. Finally, as the trial court explained in its sentencing order, while the PVV aggravator is not dependent on a defendant targeting a victim due to the victim's age or disability, Deviney "knew Ms. Futrell suffered from MS and that it made her weak. Such circumstances illustrate the outward and apparent nature of Ms. Futrell's condition. Her vulnerability was palpable."

Accordingly, because there is competent, substantial evidence to support the PVV aggravator, Deviney is not entitled to relief on this claim.

### 5. HAC Aggravator

Finally, Deviney challenges the trial court's instruction on the HAC aggravator and the jury's and trial court's subsequent finding of that aggravator. As Deviney agreed to the HAC instruction before it was given to the jury, this claim is not properly preserved for our review. *See Warfel*, 82 So. 3d at 65. Moreover, there is no merit to Deviney's claim that the finding of the HAC aggravator was in error.

To establish the HAC aggravator, the State must prove beyond a reasonable doubt that "[t]he capital felony was especially heinous,

atrocious, or cruel." § 921.141(2)(a), (6)(h), Fla. Stat. (2017). In

analyzing the HAC aggravator, we have explained:

> It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Williams v. State*, 37 So. 3d 187, 198 (Fla. 2010) (quoting

*Hernandez v. State*, 4 So. 3d 642, 668-69 (Fla. 2009)); *accord Buzia*

*v. State*, 926 So. 2d 1203, 1211 (Fla. 2006) ("To qualify for this

aggravator, 'the crime must be both conscienceless or pitiless and

unnecessarily torturous to the victim.' " (quoting *Hertz v. State*, 803

So. 2d 629, 651 (Fla. 2001))). The focus of the HAC aggravator is

"on the means and manner in which death is inflicted and the

immediate circumstances surrounding the death." *Pham v. State*,

70 So. 3d 485, 497 (Fla. 2011) (quoting *Brown v. State*, 721 So. 2d

274, 277 (Fla. 1998)). "[T]o support a finding of this aggravator, 'the

evidence must show that the victim was conscious and aware of

impending death.' " *Williams*, 37 So. 3d at 199 (quoting *Douglas v.*

*State*, 878 So. 2d 1246, 1261 (Fla. 2004)). "[N]othing done to the victim after the victim is dead or unconscious can support this aggravator." *Buzia*, 926 So. 2d at 1212. Therefore, a victim's suffering and "awareness of impending death is critical in determining whether [an attack] unnecessarily tortured the victim." *Id.*; *accord Cox v. State*, 819 So. 2d 705, 720 (Fla. 2002) ("Obviously, a victim's suffering and awareness of his or her impending death certainly supports the finding of the heinous, atrocious, or cruel aggravating circumstance where there is a merciless attack and beating as occurred here.").

In the instant case, the trial court made the following findings when analyzing the HAC aggravator:

> Ms. Futrell sustained a large, deep slash completely across the front of her neck. The incision went through Ms. Futrell's skin, small veins, the jugular vein, voice box, larynx, and the front half of her esophagus. The dark red color of the injury and aspirated blood indicate Ms. Futrell was alive when this wound was inflicted. As a result of the deep neck incision, Ms. Futrell died of hypovolemic shock with asphyxia. In other words, she bled to death while suffocating from a severed breathing tube. After sustaining this injury, it could have taken seconds to minutes for Ms. Futrell to die.
> Absent her deep neck wound, Ms. Futrell had various blunt-force and sharp-force injuries. She had scrapes on the left side of her head, including her face, lip, and nose, as well as a black eye. These injuries likely

- 24 -

resulted from separate blows to Ms. Futrell's body and because of the hemorrhage present with these injuries, Dr. Giles determined Ms. Futrell was alive when they were sustained. She had superficial incisions and sharp-force injuries around her collarbone and the inside of her arm. On her back, Ms. Futrell had bruises and sliding-type abrasions. Ms. Futrell had various defensive wounds such as bruises on her hands, wrists, and forearms. While some were fresher than others, the multiple injuries to Ms. Futrell's face, torso, and upper extremities were consistent with a struggle.

Dr. Giles also noted Ms. Futrell had a blunt-force, crushing injury to both sides of her neck indicative of manual strangulation. Due to the nature of this fracture, it is clear Ms. Futrell sustained this crushing force after her neck was slit and was likely inflicted after death or late in the process of dying. This Court notes events occurring after the victim loses consciousness are not relevant to the HAC determination and, thus, declines to consider this strangulation-type injury to Ms. Futrell's neck.

While the instant penalty phase jury was not privy to Defendant's testimony during the guilt phase portion of the instant proceedings, this Court finds it relevant to note Defendant's version of events when analyzing this aggravating factor. Defendant admitted to slicing Ms. Futrell's throat and stabbing her three times in the chest. He acknowledged Ms. Futrell suffered and knew she was going to die when he cut her throat, explaining it took thirty to forty-five seconds for Ms. Futrell to die and she was aware she was dying the entire time. Defendant's attack on Ms. Futrell was merciless and the force behind Defendant's blows was evidenced by his broken knife blade. While receiving these blows, Ms. Futrell was aware of her imminent passing, gasping for air and bleeding to death. Her attempt to fight off Defendant was futile as her carved body was left lifeless on her living room floor.

(citations omitted.)

We agree with the trial court's characterization of the evidence supporting its finding of the HAC aggravator. Dr. Giles testified that Futrell was alive when Deviney inflicted the fatal slash wound on her neck and lived up to two minutes before her death. Dr. Giles explained that there were defensive wounds on both of Futrell's arms, consistent with a struggle between her and Deviney prior to her death, and noted that Futrell had suffered further sharp- and blunt-force wounds while she was still alive due to the hemorrhaging present. Additionally, we note that Futrell knew the identity of her murderer, as she had known Deviney as a child, often had him over to her house, and treated him as a grandson. *Cf. Barnhill*, 834 So. 2d at 850 (upholding the finding of an HAC aggravator where the victim was of advanced age, struggled with his murderer before being strangled, knew who his murderer was, and "had always shown [his murderer] kindness and generosity").

Deviney's reliance on *Campbell v. State,* 159 So. 3d 814 (Fla. 2015), and *Elam v. State*, 636 So. 2d 1312 (Fla. 1994), two cases in which this Court found that the HAC aggravator was improperly found by the trial court, is misplaced. In *Campbell*, the defendant

- 26 -

challenged the trial court's finding of the HAC aggravator where it was undisputed that the victim was asleep when he was first struck on his head by the defendant with a hatchet, but briefly awakened before the defendant struck him again. 159 So. 3d at 832. At trial, the medical examiner testified that the victim's "wounds were 'very severe' and 'potentially could cause instant death or near instant death,' but could have taken '[a]nywhere from an instant or a few seconds to minutes or possibly even hours,' " that the victim had no defensive wounds, and that it was unlikely the victim remained conscious until his death. *See id.* at 819, 833. This Court found the medical examiner's testimony to be ambiguous and uncertain and, therefore, determined that the State failed to meet its burden of proving the HAC aggravator beyond a reasonable doubt. *Id.* at 834.

However, as we noted in *Campbell*, "an important factor in determining if the victim was conscious and aware of impending death [is] the presence of defensive wounds." *Id.* at 833; *see also King v. State*, 130 So. 3d 676, 684 (Fla. 2013) ("This Court has 'affirmed findings of HAC where defensive wounds revealed awareness of impending death.' " (quoting *Guardado v. State*, 965

- 27 -

So. 2d 108, 116 (Fla. 2007))). Unlike *Campbell*, there was no testimony by the medical examiner at trial suggesting that Futrell's death was instantaneous. Rather, Dr. Giles testified that after Futrell suffered the fatal neck wound, she would have lived for a period between thirty seconds and two minutes as she suffocated and bled to death. Additionally, Dr. Giles explained that the defensive wounds on Futrell's arms, as well as the other wounds present on her face and body that occurred while she was still living, indicated that Futrell struggled with Deviney before he inflicted the fatal wound. And, as the trial court noted, Deviney himself admitted that Futrell suffered and was aware that she was dying. Therefore, *Campbell* is distinguishable from the instant case.

We also find *Elam* distinguishable. In *Elam*, the defendant struck the victim "with his fist, knocking him to the floor, then picked up a brick and struck him several times on the head, killing him." 636 So. 2d at 1312. This Court disagreed with the trial court's finding of the HAC aggravator in the case, stating:

> Although the defendant was bludgeoned and had defensive wounds, the medical examiner testified that the attack took place in a very short period of time ("could have been less than a minute, maybe even half a minute"), the defendant was unconscious at the end of

> this period, and never regained consciousness. There was no prolonged suffering or anticipation of death.

*Id.* at 1314. Unlike *Elam*, the evidence in the instant case establishes that Deviney and Futrell engaged in a struggle before Deviney inflicted the fatal wound to Futrell's neck and that Futrell was alive for a period of thirty seconds to two minutes after that wound occurred. *Cf. Perez v. State*, 919 So. 2d 347, 355, 379 (Fla. 2005) (upholding the finding of an HAC aggravator where the victim was stabbed numerous times and suffered defensive wounds and the medical examiner's testimony as to "the outer bounds of consciousness"—"within seconds to a minute or two" as a result of neck wounds and "ten to fifteen minutes" for torso wounds— "exceeded that established in *Elam*"). Additionally, following our decision in *Elam*, we have repeatedly upheld a trial court's finding of an HAC aggravator where the victim suffered defensive wounds, even though there was evidence suggesting that the victim may have lost consciousness or died soon after those defensive wounds occurred. *See, e.g., King*, 130 So. 3d at 685 (finding HAC aggravator supported by competent, substantial evidence where the victim suffered head wounds, which would have caused her to lose

consciousness "very quickly," but also defensive wounds on her hand and arm, which demonstrated she was "conscious and aware of her impending death"); *Barnhill*, 834 So. 2d at 850 (upholding HAC aggravator where it was unclear when the victim lost consciousness after an initial attempt at manual strangulation other than the medical examiner's testimony that it would be "within one to two minutes"); *Guzman v. State*, 721 So. 2d 1155, 1157, 1160 (Fla. 1998) (finding HAC aggravator to be clearly supported by the evidence where an intoxicated victim was conscious for at least the onset of the defendant's attack and had a defensive wound on his left hand).

Because there is competent, substantial evidence in the record demonstrating that Futrell suffered before she died and was aware of her impending death, no error occurred when both the jury and trial court found the HAC aggravator. Therefore, we deny this claim.

## C.   CONCLUSION

Based on the foregoing analysis, we affirm Deviney's sentence of death.

It is so ordered.

POLSTON, MUÑIZ, and COURIEL, JJ., concur.
LAWSON, J., concurs in part and concurs in result with an opinion, in which CANADY, C.J., and GROSSHANS, J., concur.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring in part and concurring in result.

I agree that Deviney's sentence of death should be affirmed and concur in the per curiam opinion's analysis of all issues except Deviney's for-cause challenge to prospective juror Henderson based upon Henderson's repeated statements indicating an unyielding predisposition to vote for death in any case of premeditated murder. As discussed below, the per curiam opinion's conclusion that the trial court did not abuse its discretion in denying the cause challenge—which has garnered only a plurality vote—is based on a piecemeal review of the record that cannot be squared with precedent requiring us to review the voir dire transcript *in its entirety*. *See, e.g., Overton v. State*, 801 So. 2d 877, 892 (Fla. 2001) ("It is difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias [or] prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful

- 31 -

questioning declares his freedom from its influence." (quoting *Johnson v. Reynolds*, 121 So. 793, 796 (Fla. 1929))). Although Deviney was able to remove Henderson using one of the ten peremptory challenges provided for by section 913.08, Florida Statutes (2017), so that the trial court's error did not prejudice Deviney's constitutional right to a fair and impartial jury, the trial court's error in denying the cause challenge constitutes per se reversible error under this Court's decision in *Trotter v. State*, 576 So. 2d 691, 693 (Fla. 1990) (holding that the erroneous denial of a cause challenge is per se reversible error even under circumstances where the juror is stricken using a peremptory challenge and no biased juror is seated).

I would nonetheless affirm on this issue because "peremptory challenges are not of constitutional dimension." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 311, 313-14 (2000); *Jefferson v. State*, 595 So. 2d 38, 41 (Fla. 1992). Thus, *Trotter*'s per se rule is clearly erroneous, as there is no constitutional rationale for this Court to disregard the Florida Legislature's mandate to apply the harmless error standard. Moreover, there is no valid reason, such as reliance interests, to

justify our continued adherence to *Trotter*. *See State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020). I would therefore recede from *Trotter* and replace its per se rule with the harmless error standard set forth in section 924.33, Florida Statutes (2017), which was thoroughly examined by this Court in *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986). Because the record in this case establishes that the erroneously denied cause challenge to Henderson was harmless and that Deviney received a fair and impartial jury, Deviney's claim is without merit and I therefore concur in the plurality's result on this issue.

I. **The trial court erred in denying the cause challenge to prospective juror Henderson.**

At the trial court level, "[t]he test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." *Ault v. State*, 866 So. 2d 674, 683 (Fla. 2003). Where "any reasonable doubt exists as to whether the juror possesses an impartial state of mind," the trial court must excuse that juror for cause. *Id.* In a capital case, "this standard is met if a juror's views on the death penalty 'prevent or

- 33 -

substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath.' " *Johnson v. State*, 969 So. 2d 938, 946 (Fla. 2007) (quoting *Fernandez v. State*, 730 So. 2d 277, 281 (Fla. 1999)).  On appeal, we do not substitute our judgment for that of the trial court by conducting a de novo review as to the impartiality of the challenged juror.  *See Ault*, 866 So. 2d at 683-84.  Rather, to decide whether the trial court abused its discretion in denying the cause challenge, we review the record *in its entirety* to determine whether no reasonable jurist would have failed to find a reasonable doubt as to the challenged juror's impartiality.  *See Overton*, 801 So. 2d at 892-93; *see also Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980) ("[D]iscretion is abused only where no reasonable man would take the view adopted by the trial court.  If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.") (quoting *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 967 (9th Cir. 1942)).

At issue in this case is Henderson's view that a death sentence is always warranted for any person who commits premeditated murder.  The law does not authorize imposition of a sentence of

death for premeditated murder standing alone. Rather, death is only lawfully considered based upon the existence of certain statutorily defined "aggravating circumstances" and a weighing of any aggravating circumstance proved by the State (beyond a reasonable doubt) against mitigating circumstances presented at trial. Therefore, if there is any reasonable doubt that the juror would vote for death based solely upon the defendant's conscious decision to kill the victim before doing so, the juror must be stricken for cause. *Cf. Floyd v. State*, 569 So. 2d 1225, 1230 (Fla. 1990) (holding trial court erred in failing to excuse for cause a prospective juror who held an "unqualified predisposition to impose the death penalty for all premeditated murders"). Additionally, we have explained that a juror is "unqualified" to serve as a juror in a death penalty case "based on his or her views on capital punishment, if he or she expresses an unyielding conviction and rigidity toward the death penalty." *Barnhill v. State*, 834 So. 2d 836, 844 (Fla. 2002).

In analyzing this issue, the plurality cites the applicable standard of review, namely that this Court reviews the validity of a trial court's denial of a cause challenge against a prospective juror

for "manifest error," which "is tantamount to an abuse of discretion." *Johnson*, 969 So. 2d at 946; *accord Ault*, 866 So. 2d at 684; *Kimbrough v. State*, 700 So. 2d 634, 639 (Fla. 1997). And, the plurality likewise correctly recognizes that while appellate courts give deference to a trial court's rulings on cause challenges to prospective jurors, *see Johnson*, 969 So. 2d at 946; *Castro v. State*, 644 So. 2d 987, 989 (Fla. 1994), there must be "competent record support for the decision," *Barnhill*, 834 So. 2d at 844; *see also, e.g.*, *Ault*, 866 So. 2d at 684 ("While we give deference to the trial judge who sees and hears the juror and often has to make credibility findings based on information that cannot be easily discerned from an appellate record, the record in the instant case directly contradicts the judge's ruling." (citation omitted)).

Because "the trial court must allow the strike when 'there is basis for any reasonable doubt' that the juror had 'that state of mind which would enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial,' " *Carratelli v. State*, 961 So. 2d 312, 318 (Fla. 2007) (quoting *Singer v. State*, 109 So. 2d 7, 23-24 (Fla. 1959)), and because "ambiguities or uncertainties about a juror's impartiality" are to be

resolved "in favor of excusing the juror," *id.*, our precedent also requires that appellate courts must consider a prospective juror's statements "in their totality," *Johnson*, 969 So. 2d at 946, and cannot affirm a trial court's denial of a challenge for cause based upon some statements indicating that the juror would be impartial or could set aside a disqualifying view where the record as a whole precludes any reasonable jurist from concluding beyond a reasonable doubt that the juror is impartial. *Overton*, 801 So. 2d at 892-93; *see also Canakaris*, 382 So. 2d at 1203; *Hamilton v. State*, 547 So. 2d 630, 633 (Fla. 1989) (finding the trial court abused its discretion in denying a cause challenge even though "the juror in this case stated in response to questions from the bench that she could hear the case with an open mind," where "her other responses raised doubt as to whether she could be unbiased").

Considering Henderson's responses "in their totality," *Johnson,* 969 So. 2d at 946, this case presents a clear case for finding an abuse of discretion, especially because Henderson's *final* position was a statement of disqualifying bias.

During the State's initial questioning of Henderson, Henderson stated that he would "[a]bsolutely" consider the death penalty and

vote for it in an "appropriate case." The State then asked

Henderson to rate himself on a scale of zero to five, with a zero

indicating he "could never impose" the death penalty and a five

indicating he "firmly believe[d] in the death penalty," and

Henderson rated himself as a five. Defense counsel later engaged

with Henderson as follows:

> [DEFENSE]: . . . Basically someone's been found guilty of first degree murder, premeditated, specific intent and they killed someone or they killed someone during . . . the commission of a certain felony or attempted felony. Felonies can be burglary, home invasion, sexual battery. Let me make sure I capture them all, robbery, kidnapping, the murder of another individual. There's no defense of others. The person is not insane. It's not self-defense. They were able to form a specific intent.
>
> Sir, do you believe that that person who has been found guilty should automatically -- . . . the death penalty should automatically be imposed?
>
> [HENDERSON]: I would say, no. There are going to be other circumstances that I'd like to have full knowledge of.
>
> [DEFENSE]: Okay. And what are those circumstances, sir?
>
> [HENDERSON]: State of mind at the time of the crime.
>
> [DEFENSE]: Okay. If the person's been found guilty of first degree murder then . . . they're able to form the specific intent because there's premeditation.
>
> [HENDERSON]: Uh-huh.
>
> [DEFENSE]: Is there another state of mind that you would like to know?
>
> [HENDERSON]: Not really.
>
> [DEFENSE]: Okay.

[HENDERSON]: If it's premeditated it's premeditated.

[DEFENSE]: Yes, sir. And in that case would the death penalty -- would you automatically impose the death penalty?

[HENDERSON]: I would.

Although Henderson responded affirmatively to the State's subsequent questioning regarding whether he could "follow the law," whether he understood the death penalty was not automatic, and whether he could listen to and weigh the aggravators and mitigators, Henderson's answers to defense counsel's follow-up questioning clearly demonstrated a reasonable doubt as to Henderson's impartiality. Specifically, even after Henderson made statements indicating that he would be able to follow the law and would not automatically vote to impose the death penalty based upon premedition alone, defense counsel asked Henderson if he could ever "vote for life without the possibility of parole" where "a person has a specific intent and has committed the murder in a premeditated fashion." Henderson responded, "The premedition is the biggest factor for me. *If the thought has been involved prior to the actual act then I could not vote for a life sentence. It would be death.*" Defense counsel again asked Henderson if his "sentence on

first degree premeditated murder where a person had a specific intent to kill" would be death, to which he replied, "That is correct." The State made no attempt to further rehabilitate Henderson after he firmly, finally, and unequivocally stated that he would vote to impose the death penalty based solely upon the defendant's pre-formed intent to kill, i.e., premeditation. This firmly held view is disqualifying in a death penalty case, *see Floyd*, 569 So. 2d at 1230, and our precedent clearly dictates that we find an abuse of discretion in denying the cause challenge under these circumstances, *see Overton*, 801 So. 2d at 892-93; *Hamilton*, 547 So. 2d at 633.[7]

*Bryant v. State*, 656 So. 2d 426 (Fla. 1995), is also on point and requires the same result. In that case, six jurors were challenged for cause on grounds that they "expressed strong support of the death penalty and a predisposition to impose the

_____

7. The instant case is distinguishable from this Court's decision in *Barnhill*, where the relevant jurors did not express an unyielding conviction or rigidity toward the death penalty and were adequately rehabilitated by the State and the trial court. *See* 834 So. 2d at 844-45. Unlike the jurors in *Barnhill*, following the State's attempt at rehabilitation, Henderson again expressed his view that he would automatically impose the death penalty in the case of a premeditated murder.

death penalty if the defendant was convicted of first-degree murder." *Id.* at 428. All cause challenges were denied, and this Court found no abuse of discretion with respect to five of the challenged jurors, who upon questioning by the state attorney "stated either that they would follow the court's instructions or that they would weigh the aggravating and mitigating factors to determine whether death was the appropriate sentence." *Id.* at 428. With respect to the final prospective juror, however, we did find an abuse of discretion, reasoning that even though the prospective juror "stated that he could follow the court's instructions, his other responses were *sufficiently equivocal* to cast doubt on this." *Id.* (emphasis added). This is a clearer case for finding an abuse of discretion than *Bryant* because even after the State's attempted rehabilitation, Henderson *unequivocally* stated that he "could not vote for a life sentence" if the killing was premeditated and that his "sentence on first degree premeditated murder where a person had a specific intent to kill" would be death.

Recently, in *Martin v. State*, No. SC18-896, slip op. at 23-24 (Fla. May 6, 2021), we explained:

Under our case law, a trial court must grant a cause challenge if there is any reasonable doubt that the juror possessed the state of mind that would have enabled the juror to render an impartial verdict. *Cozzie v. State*, 225 So. 3d 717, 727 (Fla. 2017). That generous, prophylactic standard excludes many potential jurors whose presence would not have violated the defendant's constitutional right to an impartial trial if they had served on the jury.

If we were to uphold the trial court's denial of a cause challenge under these circumstances, the import would be breathtaking. Had Deviney exercised all peremptory challenges on other potential jurors, Henderson would have been seated as a juror and there would be no recourse on appeal. The same would be true for any other juror who repeatedly expressed a disqualifying view, even after attempted rehabilitation, but also said something that could be read as meaning that the juror would be impartial. This result would be untenable because it would effectively mean that there is no appellate recourse for the denial of a cause challenge when the appellate record manifestly demonstrates "reasonable doubt" as to the juror's impartiality and objectively demonstrates that the trial judge failed to resolve "ambiguities or uncertainties about a juror's impartiality . . . in favor of excusing the juror." *Carratelli*, 961 So. 2d at 318. Furthermore, this result could not be

explained away as an appellate court deferring to the credibility determination of a trial judge. It would defy all reason to conclude that the trial court "believed" Henderson when he said that he could follow the law but found his repeated and unambiguous statements that he could not vote for life in any case of premeditated murder unworthy of belief. For one thing, there is no such finding in the record, and for another, we know what the trial judge heard because Henderson's words are memorialized in the record. And those words would have led any reasonable jurist to strike Henderson for cause.

Applying our precedent, and mindful that a prospective juror's statements must be considered "in their totality," *Johnson*, 969 So. 2d at 946, and that the trial court must grant the strike "when there is basis for any reasonable doubt" that the juror is impartial, *Carratelli*, 961 So. 2d at 318 (quoting *Singer*, 109 So, 2d at 23)— here, because of an unyielding predisposition to death, *see Floyd*, 569 So. 2d at 1230—I conclude that the trial court abused its discretion in denying the cause challenge to Henderson. *Cf.*

*Overton*, 801 So. 2d at 892-93; *Hamilton*, 547 So. 2d at 633.[8]

Although the abuse-of-discretion standard of review is highly deferential, it is not a license to rubber-stamp the trial court through the type of piecemeal review on which the plurality's decision rests. Rather, to be entitled to deference, the trial court's ruling must be reasonable. *See Canakaris*, 382 So. 2d at 1203. In

---

8. Our district courts have likewise refused to substitute a rubber stamp for the required ruling of error where the record demonstrates a reasonable doubt as to a prospective juror's impartiality. *See, e.g.*, *Lowe v. State*, 718 So. 2d 920, 922-23 (Fla. 4th DCA 1998) ("[The] juror's single statement that he would acquit if the state presented insufficient evidence was tortuously teased from him only by the most pointed of leading questions. Even if it had been spontaneous, after his repeated assertions imposing on the defendant some burden to erase any idea of guilt, this single statement could not possibly evidence the correction or elimination of a view so resolutely held and repeatedly stated."); *Huber v. State*, 669 So. 2d 1079, 1082 (Fla. 4th DCA 1996) ("Even though [the] prospective juror . . . eventually said he would be able to follow the law and require the state to prove its case beyond a reasonable doubt, his original expression of doubt about his ability to presume the defendant innocent because he believes that police don't arrest innocent people is a basis for reasonable doubt that he might not be able to render an impartial verdict."); *Gibson v. State*, 534 So. 2d 1231, 1231-33 (Fla. 3d DCA 1988) (holding the trial court erred by failing to excuse for cause a prospective juror who, despite ultimately indicating that if she had a reasonable doubt she would find the defendant not guilty, also stated that she would "like to hear the whole story" and that "if they are innocent, they can tell their side of the story to the judge" because her answers "gave rise to a reasonable doubt as to whether she could set aside her bias, follow the court's instructions, and render an impartial verdict").

this case, there is simply no way for any reasonable jurist to read the voir dire transcript *in its entirety*, *see Overton*, 801 So. 2d at 892-93, and come to any conclusion other than a reasonable doubt exists as to Henderson's impartiality.

## II. The trial court's error would be reversible error under *Trotter*.

Although it was error for the trial court to deny the cause challenge to Henderson, the analysis does not end there. In *Trotter*, this Court explained that where a trial court erroneously denies a cause challenge, "[t]o show reversible error, a defendant must show that all peremptories had been exhausted and that an objectionable juror had to be accepted." 576 So. 2d at 693 (alteration in original) (quoting *Pentecost v. State*, 545 So. 2d 861, 863 n.1 (Fla. 1989)). The defendant "must identify a specific juror whom he otherwise would have struck peremptorily," and "[t]his juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted." *Id.*

- 45 -

Turning to the record here, after the trial court denied the cause challenge to Henderson, Deviney exercised a peremptory challenge and struck Henderson from the jury. After exhausting his remaining peremptories on other potential jurors, Deviney asserted cause challenges to three prospective jurors—Swanstrom, Parrott, and Pompey. The trial court denied those cause challenges and also denied Deviney additional peremptory challenges to strike them. Swanstrom, Parrott, and Pompey each sat on the jury. Thus, it is undisputed that after Deviney's cause challenge to Henderson was denied, (1) Deviney exhausted his peremptories, (2) Deviney was denied additional peremptories to strike three prospective jurors he had already attempted to strike for cause, and (3) the three "objectionable" prospective jurors actually sat on the jury. Under *Trotter*, Deviney has demonstrated reversible error and would be entitled to a new penalty-phase trial.

III. **We should recede from *Trotter* and adopt the harmless error standard in reviewing trial court rulings on cause challenges.**

Despite the foregoing analysis, however, I reach the same result as the plurality in its analysis of the denied cause challenge to Henderson. As the State correctly argues in its brief, the *Trotter*

error standard acts as a per se error rule that requires reversal of cases even where there is no prejudice to a defendant's right to a fair and impartial jury. *Trotter* disregards the longstanding requirement that Florida courts apply the legislatively mandated harmless error standard unless constitutional reasons dictate otherwise. As discussed below, I would recede from *Trotter* and adopt the harmless error standard when considering an erroneously denied cause challenge.

Section 924.33, which sets forth the harmless error standard in Florida, provides that "[n]o judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant." In *DiGuilio*, this Court considered the harmless error standard, which places the burden on the beneficiary of the error "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." 491 So. 2d at 1135. This Court explained:

Section 924.33 respects the constitutional right to a fair trial free of harmful error but directs appellate courts *not* to apply a standard of review which requires that trials be free of harmless errors. . . . Contraposed to this legislative authority, the courts may establish the rule that certain errors *always* violate the right to a fair trial and are, thus, per se reversible. To do so, however, we are obligated to perform a reasoned analysis which shows that this is true, and that, *for constitutional reasons*, we must override the legislative decision.

*Id.* at 1134. This Court described "[p]er se reversible errors" as errors "which are 'so basic to a fair trial that their infraction can never be treated as harmless error.' " *Id.* at 1135 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)).

Significantly, United States Supreme Court precedent does not treat the loss of a peremptory challenge because of an erroneously denied cause challenge to a prospective juror as per se reversible error. In *Ross*, the United States Supreme Court, in reviewing a state court proceeding, "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury," as "peremptory challenges are not of constitutional dimension." 487 U.S. at 88. Rather, "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth

Amendment was violated."  *Id.*; *see also Martinez-Salazar*, 528 U.S. at 311, 313-14 (reaffirming this principle in the context of a federal trial).[9]

---

9.  In *Martinez-Salazar*, the United States Supreme Court rejected the government's argument that "under federal law, a defendant is obliged to use a peremptory challenge to cure the judge's erro[neous]" denial of a cause challenge, and further held "that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."  528 U.S. at 307.  *Martinez-Salazar* may have left open the issue of whether, under federal law, "normal principles of waiver . . . disable a defendant from objecting on appeal to the seating of a juror he was entirely able to prevent" through the use of a peremptory challenge.  *Id.* at 318 (Scalia, J., concurring in the judgment).  However, subject to the possible exception—which was not at issue in *Martinez-Salazar* and is likewise not argued in Deviney's case—that the right to due process may be violated where the trial court "deliberately misapplied the law in order to force the defendant[] to use a peremptory challenge," *see id.* at 316 (citing *Ross*, 487 U.S. at 91 n.5), the United States Supreme Court in *Martinez-Salazar* solidified that federal law affords no relief for the curative use of a peremptory challenge unless an actually biased juror sits on the jury, *id.* at 307, 316; *see also id.* at 315-16 (explaining that using a peremptory challenge to cure the wrongful denial of a cause challenge does not constitute the *loss* of a peremptory challenge but rather the *use* of a peremptory challenge "in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury").

Additionally, in Florida, the use of peremptory challenges in criminal trials is a statutory creation,[10] as the Florida Constitution does not establish a defendant's right to peremptories. Notably, subsequent to *Trotter*, this Court recognized that "[i]t is the right to an impartial jury, not the right to peremptory challenges, that is constitutionally protected," as peremptories "merely are a 'means of assuring the selection of a qualified and unbiased jury.'" *Jefferson*, 595 So. 2d at 41 (footnote omitted) (quoting *Batson v. Kentucky*, 476 U.S. 79, 91 (1986)); *see also Meade v. State*, 85 So. 2d 613, 615 (Fla. 1956) (characterizing peremptory challenges as a tool for "the effectuation of the constitutional guaranty of trial by an impartial jury"). Accordingly, there is no federal or state constitutional right to peremptory challenges.

In light of these principles, it is clear that *Trotter*'s focus on peremptories—regardless of whether a defendant was able to seat a qualified and unbiased jury—erroneously disregards the legislative mandate for appellate courts to apply harmless error review in Florida. *Trotter* fails to give a "reasoned analysis" to explain why an

---

10. *See* § 913.08, Fla. Stat. (2017).

erroneously denied cause challenge always violates the right to a fair and impartial jury and why, "*for constitutional reasons,*" *DiGuilio*, 491 So. 2d at 1134, this Court is required to override the legislative decision to apply harmless error review. Indeed, the rule established in *Trotter* cannot satisfy the requirements established by this Court in *DiGuilio* for disregarding the legislative mandate. As already discussed, both federal and Florida law clearly establish that peremptories are not of constitutional dimension, but instead are tools provided by statute to effectuate the right to a fair trial. To fall within *Trotter*'s per se rule, a party must identify an "objectionable" juror. 576 So. 2d at 693. Under *Trotter*, however, "objectionable" does not mean legally objectionable—a juror who is biased or partial. Instead, "objectionable" under *Trotter* simply means a juror against whom the party asserted an unsuccessful cause challenge and who ended up on the jury because the party had exhausted his or her peremptories. *Id.* If a juror is not actually biased, however, the objecting party has not suffered harm to his or her constitutional right to a fair and impartial jury. Thus, the error identified in *Trotter* does not fall within the category of per se reversible error as described by this Court in *DiGuilio*, as there is

- 51 -

not a legitimate constitutional reason for this Court to override the legislative mandate to apply the harmless error standard of review when considering an erroneously denied cause challenge. *Trotter* was wrongly decided, and appellate courts using the harmless error standard remain fully competent to protect a party's constitutionally guaranteed right to a fair and impartial jury.

As Deviney notes, this Court rejected a previous challenge to *Trotter* in *Busby v. State*, 894 So. 2d 88 (Fla. 2004). In *Busby*, this Court concluded that it was reversible error under *Trotter* for the trial court to deny a cause challenge to a prospective juror. *Id.* at 93-97. In explaining its continued adherence to *Trotter*, this Court found that "the *Trotter* test [was] necessary to properly protect the right to trial by an impartial jury . . . and to effectuate the statutory scheme granting peremptory challenges." *Id.* at 97. Despite recognizing that "peremptory challenges are not themselves constitutionally guaranteed at either the state or federal level," the *Busby* majority found that "such challenges are nonetheless 'one of the most important of the rights secured to the accused.' " *Id.* at 98 (quoting *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *overruled by Batson*, 476 U.S. 79). The majority believed that "[r]equiring the

defendant to show actual bias . . . for the forced expenditure of a peremptory challenge renders the separate statutory grant of peremptory challenges totally meaningless" and that "[t]he *Trotter* standard . . . properly preserves the distinctions between cause and peremptory challenges," as "a defendant can obtain relief for the erroneously forced expenditure of a peremptory by showing the same type of harm such challenges are intended to cure," i.e., "the seating of a juror whom the defendant suspects, but cannot prove, is biased." *Id.* at 100-01.

The analysis in *Busby* justifying the *Trotter* error standard is flawed for several reasons. Although acknowledging that peremptory challenges are not constitutionally guaranteed, the *Busby* majority tacitly equates the use of peremptories to a constitutional right, rejecting United States Supreme Court precedent on the issue. As discussed above, there is no federal or state constitutional right to peremptory challenges. Furthermore, *Busby* mischaracterizes the potential harmful error that occurs when a defendant is forced to use a peremptory challenge to cure an erroneous denial of a cause challenge. While the *Busby* majority found the potential harm to be a defendant's "depriv[ation] of the

- 53 -

entitlement to challenge those jurors whose voir dire answers reveal a real potential for bias, but who would otherwise not be subject to a challenge for cause," *id.* at 100, the purpose of peremptory challenges is to effectuate the defendant's right to a fair and impartial jury. *See Jefferson*, 595 So. 2d at 41. Therefore, the actual harm this Court must consider is whether a biased or legally objectionable juror sat on the jury after an erroneously denied cause challenge and the defendant exhausted his or her peremptory challenges. As Justice Bell succinctly explained in his concurring in part and dissenting in part opinion in *Busby*:

> As we acknowledged in *DiGuilio*, absent a legitimate constitutional reason to override the legislative codification of the harmless error rule in section 924.33, we must require that a defendant show actual harm in order for a conviction to be reversed. In other words, the defendant must meet the *Trotter* standards and must show that the juror identified as being "objectionable" was indeed a legally objectionable juror, i.e., a biased or partial juror. If the defendant makes such a showing, then harm has been proven and a violation of the defendant's constitutional right to a fair trial has been established. In such a case, the defendant would be entitled to a new trial. If the juror identified by the defendant as being objectionable is in actuality not legally objectionable, the defendant has suffered no harm and is not entitled to a new trial because any error in denying the challenge for cause was rendered harmless.

*Busby*, 894 So. 2d at 114 (Bell, J., concurring in part and dissenting in part) (citation omitted).

When considering whether to recede from erroneous precedent, this Court must consider the doctrine of *stare decisis*. *Poole*, 297 So. 3d at 506. In *Poole*, we explained "the proper approach to *stare decisis*" as follows:

> In a case where we are bound by a higher legal authority—whether it be a constitutional provision, a statute, or a decision of the Supreme Court—our job is to apply that law correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, precedent normally must yield.
>
> We say normally because "*stare decisis* means sticking to some wrong decisions." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 135 S. Ct. 2401, 2409, 192 L. Ed. 2d 463 (2015). "Indeed, *stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up." *Id.* But once we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent.
>
> The critical consideration ordinarily will be reliance. It is generally accepted that reliance interests are "at their acme in cases involving property and contract rights." *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). And reliance interests are lowest in cases—like this one—"involving procedural and evidentiary rules." *Id.*; *see also Alleyne*, 570 U.S. at 119, 133 S. Ct. 2151 (Sotomayor, J., concurring) ("[W]hen procedural rules are at issue that do

> not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced.").

*Id.* at 507.

Viewing our decision in *Trotter* through this lens, I fail to find a "valid reason *why not* to recede from" it. *Id.* *Trotter* is clearly erroneous. It would require reversal in this and other similar cases in direct contravention of the mandate of section 924.33 that "[n]o judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant." *Trotter*'s continued application in this and other similar cases would also violate the legislative mandate that "[i]t shall not be presumed that error injuriously affected the substantial rights of the appellant." § 924.33, Fla. Stat. And, as this Court stated in *DiGuilio*, "[t]he test of whether a given *type* of error can be properly categorized as per se reversible is the harmless error test itself." 491 So. 2d at 1135. Pursuant to *DiGuilio*, only "[i]f application of the [harmless error] test to the type of error involved will *always* result in a finding that the error is harmful . . . [is it] proper to categorize the error as per se reversible." *Id.* (emphasis added).

Yet, in *Trotter*, this Court did not analyze how an erroneously denied cause challenge is *always* harmful error. Nor could such error qualify as per se reversible error. As discussed above, peremptory challenges are not of constitutional dimension, and there are cases where the identified "objectionable" jurors are neither legally objectionable nor biased. The error, in that circumstance, does not prejudice a defendant's right to a fair and impartial jury. Thus, the per se reversible error standard in *Trotter* lacks any constitutional rationale to override the Legislature's mandate that the harmless error rule should be applied and is, therefore, clearly erroneous. Moreover, there are no reliance interests that mitigate toward continued adherence to *Trotter*'s erroneous per se rule, and receding from *Trotter* and applying the harmless error standard will promote uniformity in the standard used by federal and state courts when reviewing trials held in Florida. Accordingly, I would recede from *Trotter* and apply harmless error review in determining whether reversible error occurred when a trial court erroneously denies a cause challenge.

**IV.  The error in denying the cause challenge to prospective juror Henderson was harmless.**

Under the harmless error standard, the State, as the beneficiary of the error, must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict," i.e., "that there is no reasonable possibility that the error contributed to the conviction." *DiGuilio*, 491 So. 2d at 1135. Because the record establishes that there is no reasonable possibility that the trial court's error in denying Deviney's cause challenge to Henderson contributed to his conviction, I would affirm as to this claim.

To determine whether harmful error occurred when the trial court denied Deviney's challenge against Henderson and his request for additional peremptories to strike jurors Swanstrom, Parrott, and Pompey—the identified "objectionable" jurors who sat on Deviney's jury—it must be determined whether any of those jurors were in fact "legally objectionable." *See Busby*, 894 So. 2d at 114 (Bell, J., concurring in part and dissenting in part); *see also Barnhill*, 834 So. 2d at 844. As stated above, for a juror to be excused for cause in a capital case, that juror's views on the death penalty must either prevent or substantially impair his or her duties as a juror. *Johnson*, 969 So. 2d at 946. If there is a reasonable doubt as to

that juror's impartiality, the juror must be excused, and this Court reviews the juror's responses in their totality. *Id.*

Reviewing the record, there was no reasonable doubt as to juror Swanstrom's impartiality. During voir dire, Swanstrom stated that he agreed the death penalty was not automatic and that he would balance aggravators and mitigators in making his decision. Similarly, there was no reasonable doubt as to juror Pompey's impartiality. Although Pompey did state he would not consider certain circumstances to be mitigating when Deviney's counsel asked him about a series of hypothetical situations, Pompey also stated he would not automatically impose death, would consider mitigating circumstances in the case, and would follow the law and keep an open mind throughout the process. Finally, a review of juror Parrott's responses in their totality demonstrates there was no reasonable doubt as to his impartiality. While Parrott initially expressed that he would automatically impose death for premeditated murder where a defendant was found competent, "[a] potential juror's initial response to questioning about the death penalty alone will not automatically provide good cause for excusal if subsequent responses alleviate doubt on the juror's ability to

impartially render an advisory verdict." *Id.* at 947. Rather, the juror must express "an unyielding conviction and rigidity toward the death penalty." *Barnhill*, 834 So. 2d at 844. During subsequent questioning, Parrott stated that he would consider mitigation even if the murder was premeditated, that he would weigh any mitigation against the aggravators, and that there were several types of mitigation he would consider when prompted by Deviney's counsel. This Court has found similar juror responses to be competent, substantial evidence to support a trial court's denial of two cause challenges in a capital case. *See id.* at 844-45 (noting for one juror, "there was no wavering and no indication from his statements that he was equivocating," and noting for a second juror, "despite her feelings [about the death penalty], she was more than willing to listen to the evidence and would consider life imprisonment based on what she heard").

Because the record establishes that no reasonable doubt exists as to the impartiality of any of the jurors who sat on the jury and whom Deviney identified as "objectionable," there is no reasonable possibility that the erroneous denial of the cause challenge to Henderson contributed to the jury's verdict, as Deviney

suffered no prejudice to his right to a fair and impartial jury. Accordingly, as the error was indeed harmless in this case, Deviney's claim lacks merit, and I agree with the per curiam opinion's result on this issue and would deny this claim.

CANADY, C.J., and GROSSHANS, J., concur.

LABARGA, J., dissenting.

Justice Lawson's concurring in part and concurring in result opinion correctly observes that during voir dire, venire member Henderson displayed "an unyielding predisposition to vote for [a sentence of] death in any case of premeditated murder." Concurring in part and concurring in result op. at 31. Consequently, the trial court abused its discretion by denying Deviney's cause challenge to Henderson. Because the failure to grant Deviney's cause challenge is reversible error under *Trotter v. State*, 576 So. 2d 691 (Fla. 1990), the only appropriate relief is to reverse and remand for a new penalty phase. Respectfully, I dissent.

An Appeal from the Circuit Court in and for Duval County,
    Mark J. Borello, Judge – 162008CF012641AXXXMA

Jessica J. Yeary, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

for Appellant

Ashley Moody, Attorney General, and Michael T. Kennett, Assistant Attorney General, Tallahassee, Florida,

for Appellee